# FOR PUBLICATION



FILED
Nov 27 2013, 5:48 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DONALD D. LEVENHAGEN**
Landman & Beatty, Lawyers, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**THOMAS R. RUGE**
**TABITHA J. LUCAS**
Lewis & Kappes, P.C.
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STERLING COMMERCIAL CREDIT – MICHIGAN, LLC, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1306-PL-513 |
| | ) | |
| HAMMERT'S IRON WORKS, INC., | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Patrick L. McCarty, Judge
Cause No. 49D03-1111-PL-43205

**November 27, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Sterling Commercial Credit – Michigan, LLC, ("Sterling") appeals the trial court's grant of summary judgment in favor of Hammert's Iron Works, Inc., ("Hammert's") on both Sterling's complaint and Hammert's counterclaim. We reverse and remand with instructions for the trial court to enter summary judgment in favor of Sterling on its complaint as well as on Hammert's counterclaim.

FACTS AND PROCEDURAL HISTORY

In May 2010, general contractor C.D. Smith entered into a $1.8 million contract with subcontractor Hammert's for construction work at the Veteran's Administration Outpatient Clinic in Evansville. Pursuant to the terms of the contract, Hammert's agreed to furnish and install structural steel framing, steel floor decking, and roof decking. The contract required Hammert's to submit lien waivers with each payment request.

Hammert's subsequently entered into a $490,000 subcontract with National Steel Erectors, Inc., ("NSE") for steel work on the project. Pursuant to the terms of this "pay if paid" agreement, Hammert's was not obligated to pay NSE until C.D. Smith paid Hammert's. NSE also agreed to submit lien waivers with requests for payment.

In August 2010, NSE entered into a Factoring and Security Agreement with Sterling. The agreement gave Sterling the right but not the obligation to purchase NSE's invoices. Before deciding whether to purchase each invoice, Sterling required a verification letter from Hammert's to confirm the validity of the invoice and that the amount specified in the invoice was earned, due, owing, and final except for payment. Specifically, the verification letter asked Hammert's to "confirm that the work, product or service has been completed and accepted and that there are not joint checks requests, offsets, credits, debits for counterclaims of any kind, and that this job is not subject to any

payment bonds, contractors bonds, performance bonds, or other bonded obligations." Appellant's Appendix at 95. The letter also stated that Sterling was "reliant upon this verification in order to provide financing to your vendor." Id. Once Sterling received a signed verification letter from Hammert's, Sterling would purchase the invoice from NSE for 85% of the invoice total and then wait to receive the total invoice amount from Hammert's. This agreement allowed NSE to bridge any cash flow gap between the time it issued the invoices and the time the invoices were due.

In September 2010, NSE submitted its first invoice ("Invoice 1") for $144,045, and Sterling sent a payment verification letter to Hammert's regarding the invoice. Hammert's verified that the $144,045 was earned, owing, and final but explained that because the terms of the contract specified pay when paid, the pay date was only an estimate because funds were not payable until Hammert's received payment from C.D. Smith. After receiving the signed Verification Letter from Hammert's, Sterling purchased Invoice 1 from NSE for $122,438.00, which was 85% of the invoice total.

In October 2010, NSE submitted Invoice 2 for $174,427.20. Sterling sent a second verification letter to Hammert's asking it to confirm that NSE had completed the work. Sterling explained that it was "reliant upon this verification in order to provide financing to [NSE]." Id. Hammert's confirmed that:

> the work, product or service [provided by NSE] has been completed and accepted and that there are no joint check requests, offsets, credits, debits or counterclaims of any kind, and that this job is not subject to any payment bonds, contractors bonds, performance bonds, or other bonded obligations.

Id. As it did in the prior verification letter, Hammert's explained that because the terms were pay when paid, Hammert's would not make the payment until C.D. Smith paid

Hammert's. Based upon the contents of the verification letter, on October 8, 2010, Sterling paid NSE $148,263.12, which was 85% of Invoice 2.

In November 2010, NSE submitted Invoice 3 in the amount of $38,866.50. Sterling sent Hammert's a payment verification letter, wherein Hammert's again confirmed the invoice amount and that the invoiced work had been completed and accepted and that there were no offsets, credits, debits or counterclaims of any kind. Hammert's also again explained the pay if paid payment contingency and stated that the pay date was only an estimate because funds were not payable until Hammert's received payment from C.D. Smith. Thereafter, Sterling purchased the invoice and paid NSE $33,036.53, which was 85% of the invoice amount.

At the end of November 2010, one month after sending Sterling the verification letter for Invoice 2, Hammert's wrote NSE and requested information about any unpaid subcontractors. Hammert's explained that it would cooperate with NSE in paying NSE's subcontractors with arrangements which could include joint check requests. NSE responded that it owed $50,116.49 to subcontractors. In December 2010, Hammert's sent Sterling $174,427.20 to pay for Invoice 2. However, in a cover letter accompanying the payment, Hammert's attempted to impose conditions on Sterling's acceptance of the check, such as paying NSE's unpaid subcontractors. Hammert's asked Sterling to consent to these conditions by signing the cover letter and returning it to Hammert's. Sterling ignored the cover letter and deposited the $174,427.20 check. Hammert's never paid Sterling the $38,866.50 under Invoice 3.

On December 14, 2010, NSE advised Hammert's that it was going out of business and would not be completing the remainder of its contract. Hammert's eventually

4

completed NSE's work and paid NSE's subcontractors an amount less than the amount remaining on NSE's contract.

In November 2011, Sterling filed a complaint against Hammert's seeking payment of the $38,866.50 from Invoice 3. Specifically, Sterling alleged that Hammert's breached its subcontract agreement with NSE when it failed to pay NSE's Invoice 3. Sterling also argued that as a result of Hammert's written representation to Sterling, on which Sterling relied in providing financing to NSE, Hammert's is estopped to deny payment on Invoice 3. Hammert's denied the allegations in Sterling's complaint and filed its own counterclaim alleging that Sterling breached an agreement when it failed to acknowledge receipt of the check for Invoice 2, failed to send Hammert's a lien waiver, or failed to issue payment to NSE's lower tier vendors, suppliers, and subcontractors. Hammert's also alleged that Sterling misappropriated its funds, and as a result of Sterling's conduct, Hammert's had to expend additional money to pay off and satisfy the liens and claims asserted by NSE's vendors, suppliers and subcontractors and suffered out of pocket damages in the amount of at least $121,986.19. Hammert's asked the trial court to enter judgment on its counterclaim and award it $121,986.19 plus interest.

In August 2012, Hammert's filed a motion for summary judgment. Sterling filed a response and a cross motion for summary judgment on the complaint as well as the counterclaim. In support of its motions, Sterling designated the affidavit of William Small, Sterling's Chief Executive Officer. In his affidavit, Small explained as follows:

> 5. [Sterling's] usual and customary practice before purchasing an account or invoice from an account creditor/assignor, such as [NSE] in the present case, is to obtain a signed Verification Letter from the account debtor. On all [NSE's] invoices to [Hammert's] purchased by [Sterling], signed Verification Letters from [Hammert's] were obtained by [Sterling].

5

6.     The purpose of the Verification Letter, such as the three signed Verification Letters of [Hammert's] in the present case, is to confirm the validity of the account or invoice in the amount stated in the Letter and establish an asset value. As a condition precedent for purchasing the invoice, [Sterling] must verify that the invoiced amount is earned, due, and owing and final except for payment. Consistent with usual and customary practice in the factoring industry, the factor assumes only the risk of creditworthiness and non-payment by the account debtor. The factor does not in the context of construction invoices assume the risk, unknown and incalculable by [Sterling] that the account creditor/assignor will incur a future liability to the account debtor on the construction project that, absent the Verification Letter, could be set off against and reduce the invoice amount owed. Usual and customary practice in the factoring industry, followed by [Sterling], is that purchasing an invoice that is subject to future unknown contingencies other than non-payment by the account debtor would make no business sense.

7.     [Sterling] relies on these Verification Letters before purchasing invoices to reduce or eliminate its assumed risk of nonpayment by an account debtor, and if it does not receive a signed Verification Letter credit in the full amount of the referenced invoice, the invoice may not be purchased by [Sterling].

Id. at 155-56.

Hammert's filed a response to the cross motion and a cross motion for summary judgment on the counterclaim. Following a hearing, the trial court granted Hammert's motion, denied Sterling's motion, and entered summary judgment in favor of Hammert's on both the complaint and the counterclaim. At a later damages hearing, the trial court ordered Sterling to pay $121,986.19 in damages plus prejudgment interest from December 10, 2010. Sterling appeals.

DISCUSSION

When reviewing the grant of a summary judgment motion, we apply the same standard applicable in the trial court. Indiana Farmers Mutual Insurance Group v. Blaskie, 727 N.E.2d 13, 15 (Ind. Ct. App. 2000). Summary judgment is proper only when the

6

designated evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Id. All facts and reasonable inferences therefrom are construed in a light most favorable to the nonmovant. Id. We must reverse the grant of a summary judgment motion if the record discloses an incorrect application of the law to those facts. Id.

The fact that the parties make cross-motions for summary judgment does not alter our standard of review. Id. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. Id.

Sterling argues that the trial court erred in granting summary judgment in favor of Hammert's on both Sterling's complaint regarding Invoice 3 and Hammert's counterclaim regarding Invoice 2 because, based upon the two verification letters Hammert's signed and returned to Sterling, Hammert's is estopped to deny payment on Invoice 3 and place payment restrictions on the payment for Invoice 2.

The doctrine of estoppel springs from equitable principles, and it is designed to aid in the administration of justice where, without its aid, injustice might result. Brokaw v. Roe, 669 N.E.2d 1039, 1041 (Ind. Ct. App. 1996), trans. denied. The doctrine of promissory estoppel is applicable where there is: (1) a promise by the promisor (2) made with the expectation that the promisee will rely thereon (3) which induces reliance by the promisee (4) of a definite and substantial nature and (5) injustice can be avoided only by enforcement of the promise. Kacak v. Bank Calumet, N.A., 869 N.E.2d 1239, 1242 (Ind. Ct. App. 2007). In other words, a promisor who induces a substantial change of position by the promisee in reliance upon the promise is estopped from denying the enforceability of the promise. Id.

7

The doctrine of promissory estoppel has been ruled applicable to commercial transactions. Id. The use of promissory estoppel is consistent with the Uniform Commercial Code's obligation of good faith and is expressly provided for as a principle of law which supplements the provisions of Indiana Code section 26-1. Id.

Hammert's argues that the doctrine of promissory estoppel does not apply in this case because there is no promise and no detrimental reliance. We address each of its contentions in turn.

Hammert's first argues that it didn't make any promises. A promise is a voluntary commitment or undertaking by the party making it (the promisor) addressed to another party (the promisee) that the promisor will perform some action or refrain from some action in the future. Kacak, 869 N.E.2d at 1242. Here, we agree with Sterling that the Invoice 2 and 3 verification letters wherein Hammert's confirmed that NSE's work, product or service was complete and accepted and there were no joint check requests, offsets, credits, debits or counterclaims of any kind, and that the job was not subject to any payment bonds, contractors bonds, or other bonded obligations were promises that Hammert's would not assert claims or defenses to reduce the value of the invoices.

As to the second argument that there is no detrimental reliance in this case, our review of the designated material reveals that the verification letters clearly stated that Sterling intended to rely upon the verifications in order to provide financing to NSE. In addition, Small's designated affidavit stated that Sterling relies on the verification letters before purchasing invoices to reduce or eliminate its assumed risk of nonpayment by an account debtor. Having found both a promise and detrimental reliance, we find that

promissory estoppel applies in this case and that Hammert's is estopped to deny payment on Invoice 3 and place payment restrictions on the payment for Invoice 2.

Although we have found no similar Indiana cases, our result is consistent with similar case law from other jurisdictions.  See Quantum Corporate Funding Ltd. v. L.P.G. Associates, Inc., 246 A.D.2d 320, 323 (N.Y. App. Div. 1998) (holding that account debtor's assurance to factor gives rise to an estoppel predicated upon the factor's reliance on that assurance in purchasing the assignment from the vendor); Dimmitt & Owens Financial, Inc. v. Realtek Industries, 280 N.W.2d 827, 829 (Mich. Ct. App. 1979) (holding that account debtor that completed verification letter estopped to deny liability).

CONCLUSION

For the foregoing reasons, we reverse the trial court's grant of summary judgment on Sterling's complaint and Hammert's counterclaim.

Reversed and remanded with instructions for the trial court to enter summary judgment in favor of Sterling on its complaint as well as Hammert's counterclaim.[1]

NAJAM, J., and MATHIAS, J., concurs.

---

[1] Because we reverse the trial court's summary judgment rulings on the basis of estoppel, we need not consider Sterling's additional grounds for reversal.