# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**JAMES H. AUSTEN**
**SHANNON G. STARR**
Starr Austen & Miller, LLP
Logansport, Indiana

ATTORNEYS FOR APPELLEE
ERIE INSURANCE EXCHANGE:

**JAMES P. STRENSKI**
**ANNA M. MALLON**
Cantrell Strenski & Mehringer, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
ALLIANZ GLOBAL RISKS U.S.
INSURANCE COMPANY:

**GINNY L. PETERSON**
Kightlinger & Gray, LLP
Indianapolis, Indiana



FILED

Jul 30 2014, 10:03 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA and 500 RANGELINE ROAD, LLC, | ) ) ) ) | |
| Appellants-Defendants, | ) ) | |
| vs. | ) ) | No. 73A01-1307-PL-311 |
| ERIE INSURANCE EXCHANGE, | ) ) | |
| Appellee-Plaintiff, | ) ) ) | |
| WELCH & WILSON PROPERTIES, LLC d/b/a HAMMONS STORAGE, ALLIANZ GLOBAL RISKS U.S. INSURANCE COMPANY, | ) ) ) ) ) | |
| Appellees-Defendants. | ) ) | |

APPEAL FROM THE SHELBY SUPERIOR COURT
The Honorable Charles D. O'Connor, Special Judge

**July 30, 2014**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Selective Insurance Company of South Carolina ("Selective") and 500 Rangeline, LLC ("Rangeline," and collectively with Selective, "Appellants") appeal the trial court's order granting the cross-motion for partial summary judgment filed by Erie Insurance Exchange ("Erie") and denying the Appellants' motion for partial summary judgment. Additionally, Allianz Global Risks U.S. Insurance Company ("Allianz") has filed an appellee's brief in this matter as an interested party after intervening below. The Appellants raise one issue which we revise and restate as whether the court erred in granting partial summary judgment in favor of Erie and denying the Appellants' motion for partial summary judgment. We reverse and remand.

FACTS AND PROCEDURAL HISTORY

Rangeline purchased a warehouse in late 2006 or early 2007. At the time of the purchase, the principals of Rangeline were Jon Smith, Greg Heuer, and Travis May. Rangeline did not have any other employees who managed the warehouse or actively participated in the business affairs of Rangeline other than Smith, Heuer, and May. Selective provided commercial general liability coverage for Rangeline's warehouse beginning on July 1, 2007. In August 2007, Doug Ewing, a Safety Management Specialist with Selective, visited the warehouse to conduct a risk evaluation survey, and,

based on recommendations made by Ewing, May retained Gardner Fire Protection to inspect the sprinkler system at the warehouse. On October 1, 2007, Jason Gardner from Gardner Fire Protection wrote a letter to May regarding his findings and identified a number of "serious issues, including but not limited to the fact that the system had no functioning alarms," and May later asked Gardner to provide an estimate of what the cost would be to repair the issues Gardner had identified. Appellants' Appendix at 355. Gardner Fire Protection was never hired to make repairs to the sprinkler system. Selective renewed the policy with Rangeline for the period of July 1, 2008 through July 1, 2009.

On April 30, 2008, Welch & Wilson Properties, LLC d/b/a Hammons Storage, ("Hammons") and Rangeline entered into a lease of the warehouse for the purpose of storing insulation manufactured by Knauf Insulation KnbH, ("Knauf"). By this time, Rangeline's owners were Smith and Heuer, although May remained active in the company and negotiated the lease with Hammons on behalf of Rangeline. Hammons prepared the first draft of the lease and sent it to Rangeline. The executed lease contains the following relevant provisions:

**J. INSURANCE AND INDEMNIFICATION** . . .

3. **TENANT'S PUBLIC LIABILITY INSURANCE**: Tenant shall, at its own cost and expense, keep and maintain in full force during the Lease term, as policy or policies of comprehensive commercial general liability insurance on an occurrence basis, insuring Tenant's activities in or about the Leased Premises against loss, damage or liability for personal injury or death of any person or loss or damage to property occurring in, upon or about the Leased Premises during the Lease term, with $1.00 Million in combined single limit coverage. Landlord, its

3

successors, assigns and any mortgagee shall be named as additional insureds under each policy maintained by Tenant. Tenant also shall maintain worker's compensation coverage to the extent required by law.

\* \* \* \* \*

5. **WAIVER OF SUBROGATION**: Any policy of property insurance maintained by either party shall include a clause or endorsement denying the insurer any rights of subrogation against the other party to the extent rights have been waived by the insured prior to the occurrence of injury or loss. Landlord and Tenant waive any rights of recovery against the other for damage or loss due to hazards covered by insurance containing such a waiver of subrogation clause or endorsement to the extent of the damage or loss covered thereby. Notwithstanding anything to the contrary contained in this provision or elsewhere in this Lease, neither party shall be deemed to have released or waived any claim against the other for damages to property within the deductible amount of such party's insurance policy.

Id. at 58-59. Paragraph K of the lease, titled "**UTILITIES AND SERVICES**," assigned

to Rangeline the duty to pay for certain utilities including the "Heat and/or Gas Service"

and the "Fire Sprinkler System." Id. at 59. Also, Paragraph L stated the following:

**MAINTENANCE AND REPAIR**: During the Lease term, Tenant shall, at its own cost and expense, maintain in good condition and repair the Leased Premises and every part thereof, except for obligations of Landlord provided for elsewhere in this Lease, ordinary wear and tear, and casualty. Tenant shall not be required to make any roof, foundation or structural alterations, repairs or replacements to the Leased Premises except as otherwise required by this Lease. Landlord shall allow Tenant the use and benefit of each and every warranty to which Landlord is entitled with respect to any items repaired or replaced by Tenant. Landlord shall be responsible for maintaining the roof, exterior walls (except doors, windows and glass), foundation and structural integrity of the building, except for damage caused by the negligence or willful act of tenant or its agents, officers, employees, contractors, licensees or invitees which is not covered or required to be covered under the property insurance to be maintained hereunder. Landlord shall be responsible for major component repairs and/or replacement of the heating, ventilation and air conditioning

4

equipment in the Leased Premises, provided that the need for such repair or replacement is not due to any abuse, misuse, damage or negligence of Tenant or its agents, officers, employees, contractors, licensees, or invitees.

Id.

After the lease was signed and the lease term started, Rangeline conducted some operations in the warehouse for the first month, and after that time Hammons had sole possession of the warehouse. Hammons had seven employees working in the warehouse during the term of the lease including Shawn Mayberry, who was the supervisor of Hammons' operation. According to Hammons' principal, Jeffrey Welch, sometime in October or November of 2008, May told him that Rangeline was going to drain the water in the sprinkler system in the Warehouse and not heat the facility. However, the furnace could be turned on by a switch or thermostat on the wall in the warehouse. Mayberry does not recall the heat being on in the Warehouse while Hammons stored the insulation there, and he never touched the furnace.

On or about December 23, 2008, the pipes of the sprinkler system at the warehouse burst, causing water to escape and damaging the Knauf insulation being stored therein. Origin and cause investigators hired by the insurers involved in this matter concurred that the cause of the loss was that the sprinkler system failed due to freezing temperatures which caused the water from the system to freeze and crack numerous cast iron fittings, causing the failure of the sprinkler heads. The investigators believed that there was no antifreeze in the sprinkler system as well as insufficient heat provided to the warehouse. Erie investigator Patrick Murphy inspected the warehouse on February 17, 2009, and he noted that the gas had been turned off at the regulating system located on

5

the outside of the warehouse.  Records from the gas provider indicate that no gas was used at the warehouse between July 29, 2008 and March 24, 2009, although gas was available to the warehouse during this timeframe.

At the time of the sprinkler failure, Erie had in full force and effect an "Ultraflex Package Policy" of insurance issued to Hammons (the "Policy"), which included commercial property coverage and commercial general liability coverage. Id. at 63.  The Policy contains the following language in the commercial general liability coverage form, in pertinent part:

SECTION I - COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

   1. **Insuring Agreement**

      a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .

   2. **Exclusions**

   This insurance does not apply to: . . .

      j. **Damage To Property**

       "Property damage" to: . . .

        4) Personal property in the care, custody or control of the insured; . . .

SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

   7. **Separation Of Insureds**

> Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:
>
> a. As if each Named Insured were the only Named Insured; and
>
> b. Separately to each insured against whom claim is made or "suit" is brought.

Id. at 108, 110-111, 115-117. Additionally, the Policy contained the following endorsement, titled "ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES" (the "A/I Endorsement"), which stated in pertinent part: "WHO IS AN INSURED (Section **II**) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule . . . ." Id. at 123. The Policy listed Rangeline as an additional insured in the relevant Schedule.

Erie paid $1,000,000 to Knauf to resolve a claim asserted by Knauf due to the loss, and on February 10, 2010, following Erie's payment to Knauf, Erie filed a subrogation lawsuit against Rangeline seeking to recover the $1,000,000 (the "Underlying Litigation"). On October 4, 2011, Erie filed, as amended, a Complaint for Declaratory Judgment seeking a determination of whether or not its policy of insurance afforded coverage to Rangeline for the claim Erie asserted in the Underlying Litigation.

Also, on December 23, 2008, Allianz had in full force and effect a policy of insurance issued to Knauf and paid to Knauf $398,266 in addition to the $1,000,000 paid by Erie as a result of the insulation damage. On March 26, 2010, Allianz moved to

7

intervene in the Underlying Litigation to assert a claim against Rangeline for recovery of the amount paid by Allianz to Knauf, and the court granted its motion. Both Allianz and Selective, who had a policy in effect at the time of the loss affording coverage to Rangeline for commercial liability, were named as defendants in Erie's declaratory judgment action.

On July 3, 2012, the Appellants filed a motion for partial summary judgment, as well as a memorandum in support and designation of evidence, addressing the issue of whether or not the Policy afforded coverage for the claim asserted by Erie in the Underlying Litigation.[1] On January 25, 2013, Erie filed a cross-motion for partial summary judgment and response to the Appellants' motion for partial summary judgment and memorandum in support addressing the same issue. On February 22, 2013, the Appellants filed a memorandum in response to Erie's cross-motion and reply in support of their motion for partial summary judgment and supplemental designation of evidence. Also, Allianz filed a memorandum in response to Erie's cross-motion on February 27, 2013. On March 6, 2013, Erie filed its response to the Appellants' reply to Erie's cross-motion for partial summary judgment.

On March 11, 2013, the court held a hearing and heard arguments on the parties' motions, and on June 21, 2013, issued an order granting Erie's cross-motion and denying the Appellants' motion for partial summary judgment. In the order, the court specifically found that the A/I Endorsement did not provide coverage for Rangeline for the

---

[1] We note that the Appellants did not address in their partial summary judgment motion the issues of coverage for the Allianz claim or the effect of any damages claimed by Rangeline arising from Erie's failure to afford coverage to Rangeline.

subrogation action in the Underlying Litigation and "provides coverage only under the Commercial General Liability Coverage part and does not provide coverage under the Ultraflex Commercial Property Coverage part. Liability coverage is provided only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to the lessee." Id. at 18.[2] The court found that Hammons as tenant had no duty regarding the sprinkler system, that accordingly there was no duty to breach and consequently Rangeline cannot be held vicariously liable for any actions or inactions on Hammons' part, that Rangeline maintained control over the sprinkler system, and that the anti-subrogation defense is inapplicable. The court concluded that Erie did not owe Rangeline a defense or indemnity in the Underlying Litigation and that there was no just reason for delay, and it entered its order as a final judgment.

ISSUE / STANDARD OF REVIEW

The issue is whether the court erred in granting partial summary judgment in favor of Erie and denying the Appellants' motion for partial summary judgment. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Mangold ex rel. Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. Mangold, 756 N.E.2d at 973. Our review of a summary judgment motion is limited to those materials designated to the trial court. Id. In reviewing a trial court's

---

[2] We note that page 5 of the court's order was mistakenly excluded from the Appellants' Appendix. However, it does appear at the end of the Appellants' brief. To the extent that we quote from page 5 of the order, we rely on the page contained in the Appellants' brief.

9

ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. Catt v. Bd. of Commr's of Knox Cnty., 779 N.E.2d 1, 3 (Ind. 2002).

The fact that the parties make cross-motions for summary judgment does not alter our standard of review. Sterling Commercial Credit-Mich., LLC v. Hammert's Iron Works, Inc., 998 N.E.2d 752, 756 (Ind. Ct. App. 2013). Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. Id. The entry of specific findings and conclusions does not alter the nature of a summary judgment which is a judgment entered when there are no genuine issues of material fact to be resolved. Rice v. Strunk, 670 N.E.2d 1280, 1283 (Ind. 1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions of law. Id. They merely aid our review by providing us with a statement of reasons for the trial court's actions. Id.

Insurance contracts "are governed by the same rules of construction as other contracts." Colonial Penn Ins. Co. v. Guzorek, 690 N.E.2d 664, 667 (Ind. 1997). The interpretation of an insurance contract is a question of law, and we address it *de novo*. Dunn v. Meridian Mut. Ins. Co., 836 N.E.2d 249, 251 (Ind. 2005). Clear and unambiguous policy language is given its ordinary meaning in order to accomplish the primary goal of contract interpretation of determining the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. Holiday Hospitality Franchising, Inc. v. AMCO Ins. Co., 983 N.E.2d 574, 577-578 (Ind. 2013). Where contractual language is ambiguous, we generally resolve those

10

ambiguities in favor of the insured, but will not do so if such an interpretation fails to harmonize the provisions of the contract as a whole.[3] Id. at 578. The failure to define a contractual term does not necessarily make that term ambiguous, nor does a simple disagreement about the term's meaning. Id. Rather, an ambiguity exists where the provision is susceptible to more than one reasonable interpretation. Id.

We also observe that there exists some disagreement in the current state of Indiana law regarding what may be considered in deciding whether an insurer has a duty to defend. "Indiana courts have previously held that '[t]he duty to defend is determined

---

[3] Erie argues that this Court should construe the language of the Policy from a neutral standpoint rather than in favor of the insured, Rangeline. We addressed a similar argument in Liberty Mut. Ins. Co. v. Mich. Mut. Ins. Co., 891 N.E.2d 99 (Ind. Ct. App. 2008). As will be discussed more thoroughly below, in that case Liberty Mutual Insurance Company ("Liberty Mutual") insured and was the subrogee of a premises owner, and Michigan Mutual Insurance Company ("Michigan Mutual") insured the tenant of the premises under a commercial general liability policy. 891 N.E.2d at 100. Before addressing the main issue, the Court discussed an argument by Michigan Mutual that "this is a dispute between insurance companies and because neither Liberty Mutual nor [the premises owner] paid any premiums for the Michigan Mutual Policy, it must be construed from a neutral stance." Id. at 102. We observed that the Indiana Supreme Court in Ind. Lumbermens Mut. Ins. Co. v. Statesman Ins. Co., 260 Ind. 32, 291 N.E.2d 897 (1973), stated:

> [W]e are in fact in this instance not dealing with the two parties to the contract. The party claiming to be an insured in this case never paid a penny's premium to the insurer. We are therefore not in a situation where we must construe the contract language any certain way and can seek out the general intent of the contract from a neutral stance.

Id. (quoting Ind. Lumbermens, 260 Ind. at 34, 291 N.E.2d at 899). Liberty Mutual suggested that Ind. Lumbermens, as well as similar cases, were distinguishable because the premises owner "was not a stranger to the contract but, rather, was specifically named as an additional insured in an endorsement attached to the policy." Id. We noted that Liberty Mutual's argument had "merit" because the premises owner "was an additional named insured (under limited circumstances, of course) and the policy was procured for its benefit, as well as" the tenant's. Id. We did not decide the issue, however, noting that we would reach the same conclusion regardless of how the policy was construed. Id.

Here, we similarly arrive at the same conclusion regardless of whether the Policy is construed from a neutral stance or from a stance favoring Rangeline. However, we note that the argument advanced by Liberty Mutual in Liberty Mut. carries more weight than it did in that case because while, the premises owner was removed as a real party in interest prior to the appeal in that case, 891 N.E.2d at 101, here, Rangeline, who was named as an insured pursuant to the A/I Endorsement, continues as a real party in interest.

11

solely by the nature of the complaint.'" Ind. Farmers Mut. Ins. Co. v. North Vernon Drop Forge, Inc., 917 N.E.2d 1258, 1268 (Ind. Ct. App. 2009) (quoting Transamerica Ins. Serv. v. Kopko, 570 N.E.2d 1283, 1285 (Ind. 1991)), reh'g denied, trans. denied. This Court in Ind. Farmers recognized that "[s]ome courts still cite Kopko as representing the current state of Indiana law," id., and indeed a case cited by the Appellants, Travelers Cas. & Sur. Co. v. Elkins Constructors, Inc., 2000 WL 724006, at *4 (S.D. Ind. 2000), reconsideration denied by 2000 WL 748091 (S.D. Ind. June 6, 2000), does just that while at the same time recognizing that "problems . . . can arise when the doctrine of liberal notice pleading mixes with the doctrine that the insurer's duty to defend is determined solely by the allegations of the complaint." Id. at *5 n.12. The Ind. Farmers Court also noted that the Indiana Supreme Court, while not specifically overruling Kopko, "has more recently entertained extrinsic, designated evidence when assessing an insurer's duty to defend," and considered facts outside of the complaint. 917 N.E.2d at 1268 (citing Auto-Owners Ins. Co. v. Harvey, 842 N.E.2d 1279, 1291 (Ind. 2006)). Based on the foregoing, as well as the fact that neither party advocates for the rule in Kopko to be applied, we consider the relevant designated evidence in determining whether Erie has a duty to defend Rangeline.

## DISCUSSION

The Appellants argue that: (A) Rangeline was covered under the Policy as an additional insured; and (B) the care, custody, or control exclusion contained in the Policy does not apply. We address each of the Appellants' contentions separately.

A. Additional Insured Endorsement

12

The Appellants argue that the A/I Endorsement contained in the Policy afforded coverage to Rangeline and that Erie's contention below that it provides only limited coverage for certain types of claims is not supported by the language of the Policy and case law. The Appellants note that there is but one case interpreting additional insured endorsements in Indiana case law, Liberty Mut. Ins. Co. v. Mich. Mut. Ins. Co., 891 N.E.2d 99 (Ind. Ct. App. 2008), and they argue that Liberty Mut. is not instructive here because the facts are distinguishable. The Appellants argue that Erie misinterprets the holding of Liberty Mut., and they note that the accident in Liberty Mut. occurred in an adjacent common area rather than on the leased premises as is the case here. The Appellants also direct our attention to certain cases for the proposition that the A/I Endorsement should be interpreted broadly, that is, "beyond merely the additional insured's vicarious liability for the actions of the named insured." Appellants' Brief at 12 (quoting Elkins, 2000 WL 724006, at *2[4]). The Appellants maintain that "Elkins and the other decisions cited [] construing A/I endorsements in a broader fashion set forth the better rule that should be applied under the facts of this case," and they argue specifically that Erie wrote the language of the instant A/I Endorsement which "does not attempt to restrict coverage to only claims for which Rangeline would have vicarious liability due to the actions of Hammons but instead extends a broader grant of coverage to Rangeline for

---

[4] Erie in its brief notes that Elkins is an unpublished decision and cites to Ind. Appellate Rule 65(D), which states that "not-for-publication memorandum decision[s] shall not be regarded as precedent and shall not be cited to any court" except under certain circumstances. Erie's Brief at 18, 18 n.4. We note, however, that Appellate Rule 65(D) concerns memorandum decisions from this Court and does not contemplate not-for-publication decisions from other courts. We also note that Elkins has been cited previously by both this Court as well as by the Seventh Circuit Court of Appeals. See Peabody Energy Corp. v. Roark, 973 N.E.2d 636, 641 n.3 (Ind. Ct. App. 2012); Lewis v. Methodist Hosp., Inc., 326 F.3d 851 854 (7th Cir. 2003).

any liability arising out of the leased premises." Id. at 16. The Appellants argue that Erie asserts in the Underlying Litigation a claim for insulation stored in a warehouse damaged as a result of a sprinkler system failure which "clearly falls within the grant of coverage of its policy." Id.

The Appellants also argue that the court in its order "focused extensively on whether or not the sprinkler system failed as a result of the fault of Rangeline" which "was not the issue before the Trial Court." Id. They assert that the court "determined that Rangeline's negligence caused the loss and therefore Erie, as the insurer for Hammons, should be able to obtain reimbursement," but this reasoning was "error as the sole question before it was whether [the Policy] afforded coverage for the loss" and that "the impact of that coverage will be addressed by the court handling the Underlying Litigation." Id. The Appellants assert that the "Separation of Insureds" language in the Policy further supports the conclusion that the A/I Endorsement affords Rangeline coverage, noting that this Court has previously addressed a similar provision and held that "even if the policy excluded coverage for an additional insured, the named insured might still have coverage . . . ." Id. at 18. The Appellants argue that "solely from Rangeline's standpoint, Erie has coverage for Rangeline if Rangeline's liability 'arises out of the ownership, maintenance or use of that part of the premises leased to [Hammons]'" which is "precisely the type of claim asserted by Erie . . . ." Id. at 18-19. Finally, the Appellants argue that Erie's argument that Hammons had no duty to maintain the sprinkler system is without merit because "[e]ven assuming, without conceding, that

14

Hammons had no such duty . . . . Nothing in the A/I [E]ndorsement states that coverage only exists if the additional insured is free from all fault." Id. at 19.

Erie begins its argument by noting the A/I Endorsement "provides coverage only under the Commercial General Liability Coverage Part (Section II) of the [] Policy; it does not provide coverage under the Ultraflex Commercial Property Coverage Part." Erie's Brief at 13. Erie also emphasizes that the A/I Endorsement states that it provides coverage "only with respect to liability arising out of the ownership, maintenance, or use of that part of the premises leased to Hammons," that accordingly no coverage exists for Rangeline under the Policy for liability arising out of a part of the warehouse "not leased to Hammons," and that "[i]t then logically follows that the [A/I Endorsement] only provides coverage for [] Rangeline for its vicarious liability with respect to those parts of the premises over which Hammons has physical control and thus legal responsibility." Id. Erie points to the Liberty Mut. case as well as Ins. Corp. of N.Y. v. Cohoes Realty Assocs., L.P., 854 N.Y.S.2d 815, 818 (N.Y. App. Div. 2008), for the proposition that no coverage exists under the A/I Endorsement where "the accident occurred in an area outside the leased premises . . . ." Id. at 15.

Erie acknowledges that the facts of this case, including that the sprinkler system is located inside the warehouse, makes "this case a closer call," but it maintains that no coverage exists under the A/I Endorsement because "the sprinkler system was not 'part of' the premises leased to Hammons." Id. at 15-16. Erie points to a provision of the Indiana Administrative Code which "impose[s] a non-delegable duty on the part of [] Rangeline to inspect, test and maintain the sprinkler system," notes that Hammons "had

15

no duty whatsoever regarding the sprinkler system . . . under Indiana law and had no control over it" and that "Rangeline explicitly retained control of the sprinkler system as it advised Hammons that it would drain it and not heat the Warehouse," and that "[i]f one accepts the proposition that Hammons had no legal duty to control vis-à-vis the sprinkler system, then there was no duty for Hammons to breach, and [] Rangeline therefore cannot be vicariously liable for any actions or inactions on the part of Hammons" and "[a]s such, the sprinkler system was not 'that part' of the premises leased to Hammons . . . ." Id. at 16.

In their reply brief, the Appellants argue that the Cohoes decision is distinguishable because it relies on a "different exclusion than at issue in this case," and it stated without discussion that the applicable Additional Insured endorsement "only applied to third party actions." Appellants' Reply Brief at 4. The Appellants argue that to the extent Erie asserts that "Rangeline shut off the gas service to the warehouse . . . off the leased premises" which supports applying Liberty Mut., the designated evidence "showed that an issue of fact existed as to whether the gas had been shut off . . . prior to the loss." Id. at 5. The Appellants suggest that accordingly, "if the issue of whether the gas service was turned off was determinative . . . summary judgment must be denied to all parties." Id. The Appellants maintain that Erie's contention that Rangeline had a non-delegable duty to maintain the sprinkler system is erroneous and that Indiana case law holds that such a duty can be delegated. The Appellants also distinguish the case of Northbrook Ins. Co. v. Am. States Ins. Co., 495 N.W.2d 450 (Minn. Ct. App. 1993), discussed in Liberty Mut., noting that the court framed the issue "as whether a given

16

liability arises out of a hazard associated with a named insured's business" and "the insulation that was damaged was precisely Hammons' business." Id. at 8. With respect to how to interpret the A/I Endorsement, the Appellants suggest that "[a] narrow construction makes more sense when the loss does not occur on the premises leased to the tenant, but occurs in some area close to the leased premises . . . ." Id. at 9. The Appellants lastly note that to the extent Erie suggests in its brief that Rangeline will be covered by Selective regarding any subrogation payments it makes to Erie, Selective's policy has not been designated as evidence and "[t]his Court should not assume without an examination of the Selective policy that Rangeline will have insurance coverage with Selective . . . ."[5] Id. at 10-11.

We begin by discussing this Court's decision in Liberty Mut. As alluded to in the parties' arguments, in Liberty Mut. Linda Swann, who worked for Trilithic, Inc. ("Trilithic"), slipped and fell on a snow- and ice-covered pathway while walking from the employee parking lot to the Trilithic facility. 891 N.E.2d at 100. Trilithic was a tenant of Duke Realty Corporation ("Duke"). Id. Liberty Mutual Insurance Company ("Liberty Mutual") insured and was the subrogee of Duke, and Michigan Mutual Insurance Company ("Michigan Mutual") insured Trilithic under a commercial general liability policy. Id. Duke was named insured on an additional insured endorsement to the Michigan Mutual policy "for no additional premium," in which the endorsement contained language identical to the A/I Endorsement of the instant case. Id. Swann and

---

[5] The Appellants note specifically that had the Selective policy been designated as evidence by Erie, "Rangeline could have argued to the Trial Court that Selective's policy also contains an exclusion for coverage for damage to personal property owned by others that is within Rangeline's control at the time of the loss." Appellants' Reply Brief at 10.

her husband filed a personal injury action against Duke in February 2002, Duke tendered the defense of the action to Michigan Mutual pursuant to the additional insured endorsement, and Michigan Mutual declined to defend or indemnify Duke against the Swanns' claims. Id. Duke filed a complaint for declaratory judgment with the trial court in which it sought a declaration that the insurance policy issued by Michigan Mutual provided coverage to Duke for the injury claims asserted by the Swanns, and Michigan Mutual filed an answer and counterclaim for declaratory judgment, claiming the policy did not provide coverage to Duke for the Swanns' claims. Id. at 101.

The parties subsequently filed cross-motions for summary judgment, and Michigan Mutual requested that Liberty Mutual be substituted for Duke as the real party in interest. Id. At the hearing on the motions for summary judgment, Duke's counsel acknowledged that Liberty Mutual, as subrogee of Duke, was the real party in interest. Id. The trial court substituted Liberty Mutual in place of Duke as the plaintiff in the declaratory judgment action. Id. On June 25, 2007, the court denied Liberty Mutual's motion for summary judgment and granted Michigan Mutual's cross-motion for summary judgment, declaring that Michigan Mutual had no obligation to defend or indemnify Duke against the Swanns' claims. Id.

On appeal, in addressing whether Michigan Mutual owed Duke a duty to defend and indemnify, we began by noting that "[a]lthough a liability insurer's duty to defend its insured against suit is broader than its duty to indemnify, this principle only applies when the risk is insured against" and that "'[w]here an insurer's independent investigation of the facts underlying a complaint against its insured reveals a claim is patently outside of

18

the risk covered by the policy, the insurer may properly refuse to defend.'" Id. at 102-103 (quoting Freidline v. Shelby Ins. Co., 774 N.E.2d 37, 42 n.6 (Ind. 2002)). The Court recited Liberty Mutual's argument that it interpret the additional insured endorsement broadly, noting Liberty Mutual's argument that "although the fall occurred outside the leased premises and as a result of Duke's negligence, liability for Swann's fall arose out of the use of that part of the premises leased to Trilithic" because she was injured "as she was reporting to work on the leased premises while using the only route to the only door into the premises which she was permitted to use by Trilithic." Id. at 103.

Liberty Mutual directed the Court's attention to Md. Cas. Co. v. Chicago & N.W. Transp. Co., 466 N.E.2d 1091 (Ill. App. Ct. 1984), in which the Illinois Court of Appeals held that the lessee's general liability insurance covered the additional insured lessor against claims asserted by the lessee's employee when she was raped in the lessor's passenger terminal as she reported to work at a news stand leased to her employer. Id. The Illinois court observed that the situation, in which an employee of the named insured suffered injury caused by the alleged negligence of an additional insured under a liability policy "immediately outside the leased premises as she was about to begin her daily employment," favored

> construing the policy liberally in favor of the insured—a procedure necessitated by the ambiguity of the "arising out of" language—the instant injuries appear to have arisen from the operation and use of the leased premises, since they would not have been sustained "but for" the victim's employment on those premises. She was about to commence her employer's operation when she was assaulted.

Id. (quoting Md. Cas. Co., 466 N.E.2d at 1094-1095).

19

We proceeded to observe that "[s]everal cases from other jurisdictions, however, have rejected such a broad interpretation of additional insured endorsements such as the one in the instant case" and included the following citation:

> Hilton Hotels Corp. v. Employers Ins. of Wausau, 629 So.2d 1064, 1065 (Fla. Dist. Ct. App. 1994) ("isolated connection insufficient to bring this accident within coverage of the policy" where lessee's employee's fall did not occur on leased premises, but rather in lessor's lobby, and "[t]he only way that this accident was even remotely related to the gift shop, was due to the pure coincidence that the injured party was a [gift shop] employee on her way to work"); Northbrook Ins. Co. v. American States Ins. Co., 495 N.W.2d 450 (Minn. Ct. App. 1993) (no coverage for landlord under tenant's general liability insurance policy with similar additional insured provision where tenant's employee fell on ice in alley behind leased premises, an area under the control of landlord); United States Fid. & Guar. v. Drazic, 877 S.W.2d 140 (Mo. Ct. App. 1994) (no coverage where employee of tenant fell in parking lot of landlord's commercial building).

Id. at 104. This Court held that it agreed "with these cases that more than an incidental connection with the leased premises is required to obtain coverage under an additional insured endorsement." We went on to state that "[o]ne of the primary functions of an additional insured endorsement in the landlord-tenant context is to protect the landlord from vicarious liability for acts of its tenant on the leased premises," and that "[t]he additional insured endorsements in these settings are meant to provide specialized protection rather than all-encompassing coverage." Id. We found the Northbrook Ins. Co. case to be "particularly instructive," and discussed the case as follows:

> [W]hile loading a truck, an employee of the lessee bakery slipped and fell on ice in the alley behind the shopping center in which the bakery was located. The employee subsequently sued the landlord, Fine Properties, alleging failure to maintain the alleyway. Like in the instant case, the landlord was an additional insured on the lessee's general liability insurance policy with respect to liability arising out of the ownership,

20

maintenance, or use of the leased premises. Concluding that the policy did not provide coverage for the landlord, the court explained:

> The question whether coverage is afforded for a particular claim depends on whether liability arises out of a hazard associated with the named insured's business. Fine Properties is entitled to coverage only if the claimed liability is based on a hazard associated with the bakery's business.
>
> The American States policy described the premises insured as the 3,200 square feet the bakery occupied in the Texa-Tonka Shopping Center. The premium charged was based on insuring the bakery, not the common areas of the shopping center. The additional insured endorsement under which Fine Properties was added as an insured specified it provided coverage, only with respect to liability arising out of the ownership, maintenance or use of the insured premises, i.e., the bakery. By its terms, the endorsement provides coverage for Fine Properties' negligence *in the bakery*. Coverage is not provided for the rest of the Texa-Tonka Shopping Center.
>
> The lease agreement between Fine Properties and the bakery required Fine Properties to maintain the alley. Failure to maintain the alley is a claim unrelated to the business of the bakery, and the American States policy therefore does not cover such a claim against Fine Properties.

Id. at 104-105 (quoting Northbrook Ins. Co., 495 N.W.2d at 453).

This Court held that Michigan Mutual did not owe a duty to defend or indemnify Duke. Id. at 105. We observed that as in Northbrook Ins. Co., Swann's fall occurred "in a common area outside of the leased premises and under Duke's control." We further noted that "there was no physical connection between the accident and the leased premises or Trilithic's business operations thereon," and that "[t]here is no allegation that the ice and snow on which Swann slipped originated on the leased premises, was caused by the leased premises, was connected to work done on the leased premises, or had any

21

other significant connection with the leased premises," which we found to be similar to the Hilton Hotels case. Id. (citing Hilton Hotels, 629 So.2d at 1065 ("accident was not a result of any physical condition which emanated from the premises, such as flowing liquid, an escaped animal, or a runaway vehicle")). We deemed the fact that Swann was on her way to work when she fell as an "'isolated connection' insufficient to bring the accident within the coverage of the policy under the additional insured endorsement." Id. (quoting Hilton Hotels, 629 So.2d at 1065).

More recently, this Court again addressed additional insured endorsements in Peabody Energy Corp. v. Roark, 973 N.E.2d 636 (Ind. Ct. App. 2012), aff'd on reh'g, 978 N.E.2d 503 (Ind. Ct. App. 2012), trans. denied. In Peabody, an employee of Beelman, who provided trucking services to Peabody Energy Corporation ("Peabody"), the owner of a site where mining operations were conducted, was injured when the "ground gave away" while he was standing near his truck to deliver a load of ash from a power plant to the mine. 973 N.E.2d at 637-638. Peabody was listed as an additional insured on Beelman's commercial general liability insurance policy provided by North American Capacity Insurance Company ("NAC") pursuant to their Master Performance Agreement ("MPA"), in which the endorsement stated as follows: "WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your operations or premises owned by or rented to you." Id. at 638 (emphasis omitted). Roark, the employee, filed a complaint against Peabody alleging negligence, Peabody demanded coverage from NAC, and NAC rejected Peabody's demand, concluding that

22

"Roark's claim did not arise 'from Beelman's work' . . . ." Id. at 639. Peabody filed a third-party complaint requesting indemnification from Beelman and seeking a declaratory judgment regarding NAC's duty to defend, and Peabody subsequently filed a motion for partial summary judgment against NAC. Id. NAC and Beelman both filed motions for summary judgment against Peabody, and following a hearing the court entered final judgment in favor of Beelman and NAC and against Peabody. Id.

On appeal, this Court discussed Liberty Mut. and noted that there we applied a narrow interpretation of the "arise out" language of the additional insured endorsement. Id. at 640-641. The Peabody court summarized the holding of Liberty Mut. as follows:

> [W]e considered that the accident occurred in a common area outside of the leased premises and under Duke's control, that there was no physical connection between the accident and the leased premises or Trilithic's business operations thereon, and that there was no allegation that the ice and snow on which Swann slipped was caused by the leased premises, was connected to work done on the leased premises, or had any other significant connection with the leased premises. We observed that the accident arose out of Duke's own failure to maintain the pathway from the parking lot to the employee entrance and that "[t]he only way Swann's fall was even remotely related to the leased premises was due to the fact Swann was on her way to work." We deemed this "isolated connection" to be insufficient to bring the accident within the coverage of the policy under the additional insured endorsement and held that Michigan Mutual had no duty to defend or indemnify Duke.

Id. at 641. In a footnote, the Peabody court observed that in rejecting a "broad interpretation" of the provision and requiring "that more than an incidental connection with the leased premises is required to obtain coverage under an additional insured endorsement," id. at 641 (quoting Liberty Mut., 891 N.E.2d at 104), the Liberty Mut. court did not reference the Elkins case (also referenced by the Appellants in their brief)

23

which observed in the year 2000 that although it could not locate Indiana case law discussing "'additional insured' provisions . . . the majority of courts to have considered the issue construe such provisions . . . broadly, encompassing coverage to extend to liability beyond merely the additional insured's vicarious liability for the actions of the named insured." Id. at 641 n.3 (quoting Elkins, 2000 WL 724006 at *2). This Court went on to state that "[e]ven if" it agreed with Liberty Mut. that the additional insured endorsement should be interpreted narrowly rather than broadly, the facts and language of the endorsements in the two cases were distinguishable. Id. at 641.

The Peabody Court first noted that, under the applicable endorsement language, "[a]t issue here is whether the liability arises 'out of [Beelman's] operations,' not whether the liability arises out of 'ownership, maintenance or use of' a leased premises," and that "although Liberty Mutual's focus on the 'connection with the leased premises' may be appropriate in the landlord-tenant context, [it] is of limited application here." Id. (quoting Liberty Mut., 891 N.E.2d at 104). The Court stated that "NAC's suggestion that Peabody's potential liability arises out of Peabody's own alleged negligence in maintaining its own property misses the mark because it does not resolve the question of whether Peabody's potential liability arises out of Beelman's operations." Id. at 642. The Court further observed that Liberty Mut. was also factually distinguishable in that "Roark was not on Peabody's property as a means to an end—to get to work—as [Swann] was. Instead, Roark was at Peabody's mine as part of his employment as a truck driver for Beelman." Id. The Court held that "[r]egardless of whether Roark was injured because of Peabody's sole negligence, the designated evidence shows that Roark's

24

injuries—the basis of Peabody's potential liability—arose out of Beelman's operations," that further, "[u]nlike in Liberty Mutual, the connection between Roark's presence at the mine and his injuries was not 'incidental' or 'isolated;' instead, Roark's injuries were directly related to his work as a truck driver for Beelman," and that accordingly Peabody was an additional insured under the policy for the purposes of Roark's complaint. Id.

Based on this Court's previous statements in Peabody and Liberty Mut., we find Rangeline to be an additional insured under Erie's Policy in the Underlying Litigation. As noted above, the A/I Endorsement contains language identical to the language of the endorsement in Liberty Mut. and states that: "WHO IS AN INSURED (Section **II**) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule . . . ." Appellants' Appendix at 123. Unlike in Liberty Mut., however, the failure of the sprinkler system, which caused the damage to the Knauf insulation, occurred within the warehouse. Also, the placement of the insulation within the warehouse for storage was precisely the business of Hammons, the tenant who was the named insured on the Policy. Thus, there is a significant, rather than isolated, connection between the accident and the leased premises.

Also, just as it was undisputed in Peabody that Roark's injuries arose out of Beelman's operations under the applicable additional insured endorsement, here it is undisputed that the damage to Knauf's insulation arose out of Hammons' use of the warehouse, which is within the scope of the A/I Endorsement. And just as Beelman's argument regarding negligence on the part of Peabody "miss[ed] the mark" because it did

25

not resolve the question of whether Peabody's potential liability arose out of Beelman's operations, Erie's argument similarly fails because it does not address whether Rangeline's potential liability arose out of Hammons's "ownership, maintenance or use of that part of the premises leased . . . ." To the extent Erie suggests that the sprinkler system is not "part of the premises leased," we decline its suggestion to construe the provision so narrowly as to find that the sprinkler system was not part of the leased premises.[6]

B.    Care, Custody, or Control Exclusion

As noted in the facts section, the Policy contained the following exclusion (the "Care Exclusion"):

---

[6] We note that the dissent would find that although "there is a significant connection between the accident and the leased premises . . . there is no connection between the accident and Hammons" because "Rangeline retained control over and responsibility for the sprinkler system . . . ." Slip op. at 38. We believe such a rule to be too narrowly focused, even by the standard set forth in Liberty Mut. Again, in that case this Court found "particularly instructive" the Northbrook Ins. Co. case, which framed the issue as "whether coverage is afforded for a particular claim depends on whether liability arises out of a *hazard associated with the named insured's business*." 891 N.E.2d at 104-105 (quoting Northbrook Ins. Co., 495 N.W.2d at 453) (emphasis added). Hammons' business was storing Knauf's insulation. It is a hazard of storing goods in a warehouse facility that such warehoused goods might become damaged by water, fire, pests, etc. Further, we disagree with the dissent's focus on a connection (or lack thereof) between the accident and the conduct of Hammons and note that the rule of Liberty Mut. focused on the accident's connection to the leased premises when this Court specifically stated that there was no duty to defend or indemnify Duke on the part of Michigan Mutual because "there was no physical connection between the accident and the leased premises *or* Trilithic's business operations thereon" and observed that there was "no allegation that the ice and snow on which Swann slipped originated on the leased premises, was caused by the leased premises, was connected to work done on the leased premises, or had any other significant connection with the leased premises." Id. at 105 (emphasis added). By the language of the A/I Endorsement, which provides specifically that "WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule but only with respect to *liability arising out of* the ownership, maintenance or use of *that part of the premises leased to you* and shown in the Schedule," the focus of the inquiry is on the accident's connection to the leased premises. Appellants' Appendix at 123 (emphases added).

Finally, as noted above we reject the notion that the sprinkler system was not a part of the premises leased by Hammons. Hammons leased the warehouse, which made up the leased premises, and we see no basis for the assertion that the sprinkler system, located *within* such leased premises, was excluded from the scope of the A/I Endorsement.

26

This insurance does not apply to: . . .

    j.  **Damage To Property**

       "Property damage" to: . . .

           4)  Personal property in the care, custody or control of the insured; . . .

Id. at 108, 110-111.

The Appellants argue that the plain language of the Care Exclusion does not apply because Erie concedes that Hammons had custody of the damaged personal property, the insulation. The Appellants assert that Erie made a two-pronged argument to the trial court that the exclusion applied – first, that Rangeline had a non-delegable duty to maintain the sprinkler system so the instrumentality causing the loss was within Rangeline's control, and second, that Rangeline exercised dual control over the insulation "so the exclusion still applied in spite of Hammon's [sic] custody of the insulation." Appellants' Brief at 20. The Appellants argue regarding Rangeline's alleged duty to maintain the sprinkler system that the Care Exclusion "says nothing about excluding coverage for personal property that is not within a party's control but which is damaged by a fixture . . . in the building that is within a party's control." Id. at 21. The Appellants contend that Erie conceded that Hammons had custody of the insulation, that the separation of insureds provision noted in the facts section above applies in which "Erie must apply th[e Care Exclusion] as if Rangeline were the only insured," and "there is no question that Rangeline did not have custody of the insulation." Id. To the extent Erie asserted below that Rangeline maintained dual control over the insulation, the Appellants

27

argue that the out-of-state cases relied upon by Erie are factually distinguishable and their rationale should not be applied under the present facts. The Appellants maintain that they have not found "any Indiana decision which has applied a concept of dual control when interpreting a 'care, custody' insurance exclusion" and that this Court should apply the rule in Am. Fam. Mut. Ins. Co. v. Bentley, 170 Ind. App. 321, 352 N.E.2d 860 (1976), which held under similar facts that certain equipment contained in a building "was not within the building owner's custody." Id. at 25.

Erie "does not dispute that . . . Hammons exercised care, custody and/or control over the Knauf insulation," but "it is undisputed that [] Rangeline also exercised 'control' over the Knauf insulation as that term is defined" recently by the Indiana Supreme Court in Holiday Hospitality Franchising. Appellee's Brief at 20. Specifically, Erie argues that Rangeline had a non-delegable duty to maintain the sprinkler system, that Rangeline controlled the sprinkler system, that the failure of the sprinkler system was the proximate cause of the loss, and that "[t]hus, Hammons and [] Rangeline exercised joint 'control' or 'power of influence' over the Knauf insulation . . . ." Id. at 21. Erie also acknowledges that the Appellants' argument regarding the separation of insureds provision in the Policy applies for the purpose of the Care Exclusion.

Also, Allianz, who is Knauf's insurer and who filed an appellee's brief as an interested party, argues that "Erie's arguments fail because case law clearly establishes that the party in possession of stored personal property is the party with the care, custody, and control, not the owner of the storage building." Allianz's Brief at 4. Allianz argues that the "argument that warehouse maintenance amounted to care, custody, and control of

28

the stored property . . . 'confuse[s] responsibility for the *premises* with responsibility for *property stored on the premises*,'" and that "[o]nly a bailee, not a lessor, assumes this . . . responsibility." Id. at 5 (quoting Marine Indem. Ins. Co. of Am. v. Lockwood Warehouse & Storage, 115 F.3d 282, 288 (5th Cir. 1997), reh'g denied, cert. denied, 522 U.S. 967, 118 S. Ct. 414 (1997)). Allianz argues that both Lockwood and Bentley "demonstrate that there is no joint control of stored property between a party that merely maintains a warehouse and the party that possesses the stored property." Id. at 6. Allianz also maintains that the cases cited by Erie below and on appeal are distinguishable and unpersuasive.

We turn first to Bentley, in which this Court affirmed the trial court in a declaratory judgment action ruling in favor of defendant owner Bentley. 170 Ind. App. at 323, 352 N.E.2d at 861. In Bentley, a Boy Scout Troop rented a portion of a "storage place and garage" located on Bentley's property "for storage of a trailer, three aluminum canoes and other camping equipment." Id. at 323, 352 N.E.2d at 861. Bentley informed the Troop that his insurance policy with American Family Mutual Insurance Company ("American") would not cover the Troop's property, and the Troop purchased insurance with the Indiana Insurance Company ("Indiana Insurance"). Id. at 323, 352 N.E.2d at 861. Bentley received compensation for the use of the building. Id. at 323, 352 N.E.2d at 861. On June 10, 1970, the building was completely destroyed in a fire along with its contents, and, after paying for the Troop's loss, Indiana Insurance demanded reimbursement from Bentley. Id. at 323, 352 N.E.2d at 862. Bentley notified American, and American informed Bentley that the property in question was not covered by the

29

policy in part pursuant to the following exclusion: "This section does not apply: Under any of the coverages, . . . j. to property damage to property used by, rented to or in the care, custody or control of any insured or property as to which the insured for any purpose is exercising physical control, . . ." Id. at 324, 352 N.E.2d at 862. American sought a declaratory judgment against Bentley and Indiana Insurance "praying that the rights of American and Bentley under an insurance policy sold Bentley by American be fixed, determined and declared." Id. at 323, 352 N.E.2d at 861. The trial court ruled in part "[t]hat the property of [the Troop] was not in the care, custody or control of defendant Bentley, nor did [Bentley] exercise physical control over said property," and "[t]hat [American's] insurance policy does provide property damage coverage to the defendant Bentley, and [American] is obligated by the terms of its policy to defend him in the pending lawsuit filed by the defendant, Indiana Insurance Company . . . ." Id. at 327, 352 N.E.2d at 864.

On appeal, this Court addressed the question of whether the trial court erred in ruling that the Troop's property "was not in the care, custody or control of Bentley and Bentley did not exercise physical control over said property." Id. at 325, 352 N.E.2d at 862. American argued that the exclusion cited above "excludes from coverage any third party property over which an insured has control, and further contend[ed] that the facts adduced in evidence were that the insured did have physical control of the property of" the Troop. Id. at 327, 352 N.E.2d at 864. Bentley argued that the exclusion did not apply because he had no control over the Troop's property "and specifically permitted them access to their property at all times." Id. at 327, 352 N.E.2d at 864. The Court agreed

30

with the trial court's finding that Bentley did not have care, custody, or control of the property and held that the exclusion did not apply. Id. at 328-329, 352 N.E.2d at 864-865.

Additionally, we find the Lockwood case cited by Allianz instructive. In Lockwood, a fire destroyed a warehouse owned by Grand Lockwood Partners Limited Partnership and managed and leased by Lockwood Warehouse & Storage ("Lockwood"). 115 F.3d at 284. Lockwood maintained insurance coverage with Insurance Company of America ("Marine Indemnity") for certain property inside the warehouse, and numerous owners of property stored inside the warehouse made claims against Marine Indemnity for the value of their damaged property. Id. Marine Indemnity initiated an interpleader action to resolve conflicting claims for the insurance proceeds, and the district court determined the amount of insurance available to be $1,275,610 plus accrued interest. Id. The court ordered Marine Indemnity to pay that amount to the court's registry, and a magistrate judge was appointed as special master to "recommend findings of facts and conclusions of law on the issues of insurable interests, calculation of damages, and priority of claims." Id.

On appeal, two of the intervenor-defendants, Enterplast, Inc. ("Enterplast") and H. Muehlstein & Company ("Muehlstein"), objected to the district court's order denying them recovery from the interpleaded funds and sought review of the court's interpretation of the Marine Indemnity insurance policy. Id. at 284-285. Lockwood had subleased space in the warehouse to Ultra Warehouse ("Ultra") and Lance Cowan, doing business as Shippers International ("Shippers"), who each stored, respectively, the property of

31

Muehlstein and Enterplast. Id. at 285. The district court found "given Enterplast's and Muehlstein's bailment relationship with sublessees of Lockwood, the Marine Indemnity policy provisions governing covered property barred the two entities from recovery." Id.

The court observed the following:

> The Marine Indemnity policy provided coverage of the following property:
>
>> (A) Personal Property of the Insured pertaining to the conduct of the Insured's business.
>>
>> (B) Personal Property of others which is directly connected with the Insured's business while in the care, custody or control of the Insured, and for which the Insured is responsible, or for which the Insured has agreed in writing prior to loss to insure.
>>
>> (C) Real Property of the Insured.
>>
>> (D) To the extent of the Insured's business interests only, improvements and betterments to buildings occupied, but not owned by the Insured.
>
> The special master determined that the policy had three coverage requirements with respect to the property belonging to those other than Lockwood that was stored in the warehouse. First, the property must have been "directly connected" with Lockwood's business. Second, the property must have been in the "care, custody, or control" of Lockwood. Third, Lockwood must either have been "responsible" for the property or have had agreed in writing, prior to the fire, to insure the property. In construing the first requirement, the special master determined that the policy covered the property of those who stored property directly with Lockwood, but did not cover the property of those, including Enterplast and Muehlstein, who stored property with a sublessee of Lockwood. Because Enterplast and Muehlstein did not enter into an agreement with Lockwood for the storage of property, the court adjudged that neither entity could establish that it had a direct relationship or involvement with Lockwood, and thus also concluded that their property could not be found to have been "directly connected" with Lockwood's business.

32

Id. The special master also found under the third requirement that Enterplast and Muehlstein were barred from recovery in that they failed to establish that Lockwood was "responsible" for their property. Id. at 285-286. The special master further found that Ultra's and Shippers' leases with Lockwood "exonerated Lockwood and its insurers from any damage claims for Ultra's and Shippers' property," and that "based on these waiver of liability provisions, Lockwood was not responsible for the goods of Ultra and Shippers or the goods of their bailees, including Muehlstein and Enterplast." Id. at 286.

Muehlstein and Enterplast argued that Lockwood was responsible for their property under its insurance policy because Lockwood "maintained control over the warehouse: that is, by directing and performing warehouse maintenance, repairs, security, housekeeping, and fire protection, among other things, Lockwood thereby assumed obligations and duties with regard to all property in the warehouse," and that Lockwood's "negligent performance of these duties . . . rendered it, as landlord, liable, and hence responsible, for the destruction to their property." Id. at 287-288. The Fifth Circuit Court agreed with the district court that Lockwood was not responsible under the insurance policy, specifically the district court's findings that "the sublease agreement between Ultra and Lockwood, and also that between Shippers and Lockwood, established a lessor-lessee relationship. Consequently, the court found that . . . Lockwood was not responsible for the property of Ultra or Shippers, or the property of their bailors, Muehlstein and Enterplast." Id. at 286, 288. The court, applying Texas law regarding landlord-tenant and bailment relationships, noted that

33

responsibility for goods is dependent on the existence of a bailor-bailee relationship. A bailee, in contrast to a lessor, assumes a duty of care with regard to both the premises and the goods in its possession. As a lessor, Lockwood had a duty to exercise care respecting the portions of the warehouse it controlled, but did not have a general duty to exercise care as to the sublessees' property stored on the premises or care with relation to the property of the sublessees' bailors. Thus, as lessor, Lockwood was not responsible for the property of the Muehlstein and Enterplast.

Id. (footnote omitted).[7]

Here, we first note that Indiana law regarding landlord-tenant and bailment relationships are sufficiently similar to the provisions of Texas law cited by the court in Lockwood, and we accordingly find Lockwood to be persuasive authority in determining whether Rangeline controlled the Knauf insulation. See Pitman v. Pitman, 717 N.E.2d 627, 631 (Ind. Ct. App. 1999) (noting that "[a] bailment is an agreement, either express or implied, that one person will entrust personal property to another for a specific purpose and that when the purpose is accomplished the bailee will return the property to the bailor" and that "[t]he standard of care required of a bailee is determined by the benefit each party derives from the bailment"); see also Houin v. Burger by Burger, 590 N.E.2d 593, 597 (Ind. Ct. App. 1992) (noting that "[i]n the absence of statute, covenant, fraud or concealment, a landlord who gives a tenant full control and possession of leased property

---

[7] The Court summarized the relevant Texas law as follows:

Under Texas law, a bailment is a delivery of goods to another which creates a duty of trust on the part of the bailee to return the deposited goods as directed. A bailee has the duty to exercise ordinary care over the goods and is therefore "responsible" for the bailor's goods. In contrast, a lease is "a transfer of interest in and possession of property for a prescribed period of time in exchange for an agreed consideration called 'rent.'" The lessor has the duty of ordinary care in maintaining the premises it controls, but does not have a duty to exercise care regarding the lessee's property stored on the premises. The lessor is therefore not "responsible" for the property of the lessee.

Lockwood, 115 F.3d at 286 (internal citations omitted).

34

will not be liable for personal injuries sustained by the tenant and other persons lawfully upon the leased property").

This court specifically ruled in Bentley that an exclusion similar to the instant Care Exclusion did not apply to circumstances in which the building owner had no physical control over the destroyed property. Also, as in Lockwood, we find that simply because Rangeline allegedly had a duty to maintain certain aspects of the *premises* including the sprinkler system, this duty does not include a duty of care with respect to the *property stored on the premises* which was governed by the contract for storage between Hammons and Knauf. Indeed, to the extent that Erie cites Holiday Hospitality Franchising for the proposition that Rangeline exercised "control" over the insulation, we observe that that the Indiana Supreme Court in that case, citing to Webster's Dictionary, defined control as "[t]o exercise authority or influence over" or "[t]o hold in restraint," 983 N.E.2d at 579 (quoting WEBSTER'S II NEW COLLEGE DICTIONARY 246 (1995)), and further noted the Black's Law Dictionary definition as "[t]o exercise power or influence over." Id. (quoting BLACK'S LAW DICTIONARY 378 (9th ed. 2009)). Our review of the facts and relevant case law does not reveal that Rangeline exercised influence over the insulation located in the warehouse leased by Hammons. It was Hammons, and not Rangeline, who entered into a contractual relationship with Knauf and who was a bailee in favor of Knauf and assumed such a duty of care. We therefore conclude that

Rangeline did not exercise "joint control" over the Knauf insulation, and that accordingly the Care Exclusion does not preclude coverage in favor of Rangeline.[8]

CONCLUSION

For the foregoing reasons, we reverse the trial court's grant of summary judgment in favor of Erie and denial of the Appellants' motion for partial summary judgment, and we remand for further proceedings consistent with this opinion.

Reversed and remanded.

BARNES, J., concurs.

ROBB, J., dissents with opinion.

---

[8] We observe that the cases cited by Erie are distinguishable from the facts present here. First, in Cashmere Pioneer Growers, Inc. v. Uniguard Sec. Co., 891 P.2d 732 (Wash Ct. App. 1995), rev. denied, Cashmere Pioneer Growers, Inc. ("Cashmere"), the storage facility at issue, was running a "controlled atmosphere" storage business in which their facility froze the stored produce. 891 P.2d at 733. Thus, the relationship between Cashmere and Taplett Fruit Picking, Inc. is properly understood to be one of bailment rather than a lessor-lessee relationship. Second, in Liberty Mut. Ins. Co. v. Zurich Ins. Co., 930 N.E.2d 573 (Ill. App. Ct. 2010), Liberty Mutual insured a hotel in which certain guest property was stolen from a wall safe located in their hotel room. 930 N.E.2d at 575. The parties asked the court to construe a "care, custody or control" exclusion similar to the Care Exclusion in this case, and the court ruled that the property was excluded. Id. at 578. In doing so, the court reasoned that "[a]s an innkeeper, [the hotel] had a duty to safeguard the property of its guests," that "[t]he innkeeper has duties similar to those involved in a bailment with respect to property brought onto the innkeeper's premises," and that "the innkeeper has custody of the property of its guests, and, in the course of its work, it assumes a duty to protect that property." Id. at 577. Finally, Stewart Warner Corp. v. Burns Int'l Sec. Servs., Inc., 527 F.2d 1025 (7th Cir. 1975), involved a security company hiring a watchman to guard a warehouse, and the watchman intentionally set fire to the warehouse causing damage to certain stored goods. 527 F.2d at 1027. The owner of the goods sought recovery from the security company's insurer in which the policy contained a care, custody, and control exclusion. Id. The court held that "the core of [the security company's] workmanship is to provide a trustworthy and capable watchman to care for the premises and their contents. If the 'care, custody or control' exclusion does not apply to such contents, the general liability insurer would bear the burden of guaranteeing such workmanship." Id. at 1030.

# IN THE
# COURT OF APPEALS OF INDIANA

SELECTIVE INSURANCE COMPANY )
OF SOUTH CAROLINA and )
500 RANGELINE ROAD, LLC, )
)
    Appellants-Defendants, )
)
      vs. )    No. 73A01-1307-PL-311
)
ERIE INSURANCE EXCHANGE, )
)
    Appellee-Plaintiff, )
)
)
WELCH & WILSON PROPERTIES, LLC )
d/b/a HAMMONS STORAGE, ALLIANZ )
GLOBAL RISKS U.S. INSURANCE )
COMPANY, )
)
    Appellees-Defendants. )

**ROBB, Judge, dissenting**

Because I agree with the trial court that the A/I Endorsement of the Policy does not provide coverage for Rangeline in the Underlying Litigation, I respectfully dissent from the majority's decision reversing the trial court.

Rangeline is an additional insured under the Policy "only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to [Hammons] . . . ." Slip op. at 7. As noted in Liberty Mut. Ins. Co. v. Michigan Mut. Ins. Co., 891 N.E.2d 99, 104 (Ind. Ct. App. 2008), which construed an identical provision, additional insured endorsements in this context are "meant to provide specialized

37

protection rather than all-encompassing coverage." The Policy, entered into between Erie and Hammons, does not provide blanket coverage for Rangeline. "One of the primary functions of an additional insured endorsement in the landlord-tenant context is to protect the landlord from vicarious liability for acts of its tenant on the leased premises." Id. I agree with the majority that there is a significant connection between the accident and the leased premises. See slip op. at 26. However, because there is no connection between the accident and Hammons, extending coverage to Rangeline in this circumstance would not serve the purpose of such coverage. As the trial court found, Rangeline retained control over and responsibility for the sprinkler system; Hammons had no duty with respect to the system. Under these circumstances, there could be no expectation that the tenant's insurance would cover the landlord who had the sole responsibility for the instrument of the damage.

As the majority notes in footnote 6, the sprinkler system was physically a part of the premises leased to Hammons. Whether Rangeline maintained responsibility for its care and maintenance by the terms of the lease or simply by its actions, Hammons had nothing to do with system. I therefore do not believe the inquiry can or should be singularly focused on the connection between the accident and the leased premises themselves. That the A/I Endorsement includes the arising out of the "ownership, maintenance or use" language suggests to me that a consideration of which entity is responsible for the failure on the leased premises causing or contributing to the loss is reasonable and appropriate. Rangeline's potential liability for a failure of the sprinkler system did not arise out of Hammons's maintenance or use of the premises; it arose out

38

of its own failures. It did not maintain the sprinkler system; it told Hammons it was going to drain the sprinkler system but then did not do so; it did not apprise Hammons that the sprinkler system had not been drained; and it did not tell Hammons that because the sprinkler system had not been drained, the warehouse temperature needed to be maintained above a certain degree. Not only did Hammons have no responsibility with regard to the sprinkler system; it had no knowledge regarding it. There is no vicarious liability here; Rangeline's liability is its own.

Accordingly, I would affirm the trial court's grant of partial summary judgment to Erie and denial of partial summary judgment to Rangeline on this issue.[9]

---

[9] Because I would hold the Policy does not cover Rangeline as an additional insured under the circumstances presented, I would not reach the issue of whether the Care Exclusion applies, and I do not address that portion of the majority opinion.